## COURT OF APPEALS,

### Feb. 24, 1914.

# THE PEOPLE v. CHARLES BECKER.

### (210 N. Y. 274.)

MURDER—APPEAL—WHEN NEW TRIAL WILL BE GRANTED—RECORD UPON
THE TRIAL OF A DEFENDANT INDICTED FOR MURDER IN THE FIRST
DEGREE EXAMINED, AND HELD THAT ERRORS, BOTH OF LAW AND
DISCRETION, IN THE ADMISSION AND EXCLUSION OF EVIDENCE AND
IN THE CONDUCT OF THE TRIAL, ARE SO SUBSTANTIAL AND SERIOUS
THAT DEFENDANT IS ENTITLED TO A NEW TRIAL.

1. On the trial of defendant for murder in the first degree, six
witnesses gave the only testimony directly tending to connect him
with the crime. Three of them were concededly implicated in the
murder and obtained immunity by giving evidence tending to con-
vict the defendant. Two of the others were convicts or persons
charged with crime who were temporarily released from jail in
order to be witnesses. The remaining one of the six, who was also
granted immunity, upon the submission of that question to the
jury, was found not to have been an accomplice, although con-
cededly participating in many events connected with the murder.
It is questionable whether there is any testimony corroborating
the testimony of these itnesses as to the guilt of the defendant.
It is claimed by the main witnesses for the People that two other
persons had knowledge of the facts relative to the conspiracy,
which was relied upon by the prosecution and which was neces-
sary to be shown in order to convict defendant, and that they could
corroborate them, but although the identity of those persons was
known to the prosecuting attorney, they were not called by him.
Upon examination of these and many other conceded facts tend-
ing to cast doubt on the People's case, held, that under all the con-
ditions attending and surrounding this case, the defendant was
entitled to a scrupulously fair and impartial trial where nothing
should be done to prejudice his case or to obscure in the minds of
the jurors the question whether the evidence justified them in
reaching the conclusion that he was guilty of the grave crime with
which he was charged.

2. Upon examination of the conduct of the trial, *held*, *first*, that the trial judge erred in not checking or correcting the statements of the district attorney in his opening characterizing the defendant as "a grafter," "a cool, calm, calculating grafting police officer," and as using his office for the protection of "his traffic in the purchase and sale of law enforcement," these statements having been directed to defendant's alleged general misconduct and corruption in no manner connected with the alleged crime for which he was on trial. *Second.* Defendant sought to obtain from the district attorney a statement of one of the principal witnesses for the prosecution, who was concededly guilty of the crime, for the purpose of cross-examination and impeachment The court declined to order it to produce, and later defendant's atorney was compelled as a condition of its production, to agree without seeing the paper to put it in evidence. *Held,* that under such circumstances the effect of the paper should have been limited to the purposes and extent of contradiction and impeachment, and should not be treated as general evidence for the purpose of correcting errors committed at the trial. *Third.* On the cross-examination of one of the accomplices, he was asked about the immunity agreement which had been executed with the district attorney. The district attorney declined to produce the agreement and the court refused to order him to do so. *Held,* that defendant was entitled to have the agreement produced at that time for purposes of cross-examination; that an attempt to conduct a cross-examination based upon its provisions without production of it would have been futile, and would have been forbidden by the court. *Fourth.* Commissions had been sent to another state to examine the witness who was charged by the defendant with being an accomplice, and evidence there taken of statements made by him which impeached his testimony given on the part of the People. These commissions were under the control of the court, but it refused on cross-examination of the witness to order them to be opened for the purpose of enabling reference to be made to them for the purpose of framing questions to be put to him as a basis for impeaching testimony. *Held,* that the request was a reasonable one and the ruling erroneous.

3. Upon examination of the circumstances connected with closing the cross-examination of the principle witness for the prosecution, *held,* that while the duration of examination of a witness must be to a considerable extent under the control of the trial judge, and he has the power if it is unduly and uselessly protracted to finally place a limit upon it, the defense should have had an opportunity

for a searching, complete and advantageous cross-examination of this witness, which was not afforded it. This error was not cured by subsequently allowing the witness to be recalled by the district attorney after all connection had been lost and permitting the witness to be then tendered to the defendant " for further and complete cross-examination." The policy of the Anglo-American system of evidence has been for two centuries to regard the necessity of testing the evidence of a witness by cross-examination a vital feature of the law, and no statement (unless by special exception) should be used as testimony until it has been probed by that test.

4.  Three of the alleged accomplices who were harmonious witnesses against the defendant were confined in a special place of detention pending the trial.  *Held*, that it was important to know whether they were in constant communication with each other for the purpose of framing their testimony, and as matter of law it was proper to show this on cross-examination of any one of them.  The defendant should have been allowed to examine each of these conceded conspirators fully and without embarrassment.

5.  In the cases of four witnesses for the prosecution, questions asked by the defendant's counsel were excluded or the examination terminated, the exclusion in some cases being accompanied by the peremptory refusal of the trial judge to hear any argument or explanation and the witnesses were subsequently recalled by the district attorney on his own motion or on the order of the court and the defendant's counsel permitted, and when he declined so to do, the district attorney ordered for him to put the questions which had been thus excluded.  *Held*, error.

6.  In a criminal case, while the judge has the right, and it is his duty, to present the evidence to the jury in such light and with such comments that the jury may see its relevancy and pertinency to the particular issue upon which it was admitted, and thus be better qualified to appreciate its credibility, he should do this in a fair and impartial manner, having due regard to the rights of the defendant and with a serious and anxious desire for their preservation, both of law and of fact.

7.  Further rulings by the court and their probable effect on the result of the trial are fully considered, and it is *held*, that so far as as these rulings were of the kind generally classed as discretionary, they did not comply with the true rule of discretion as to the conduct of a trial by the presiding judge which rests for its foundation upon the conception of a judgment exercised at every stage with open mind, fairly and impartially and in the interest of exact justice between the People and the accused; that the fundamental demand

of our law is that the accused shall have a fair trial, and if that right has been infringed, not in respect of mere technicalities, he should have another opportunity to meet his accuser and establish his innocence; that the defendant suffered from the erroneous disposition of questions, both of law and discretion, and that these errors in the aggregate are so substantial and serious that they ought not to be disregarded.

APPEAL from a judgment of the Supreme Court, rendered October 30, 1912, at an extraordinary Trial Term for the county of New York, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinions.

*Joseph A. Shay, Arthur Palmer* and *Leonard F. Fish* for appellant. The principle that every man accused of crime is entitled to a fair trial was grossly violated by the trial justice. (People v. Patrick, 182 N. Y. 187.) The remarks of the district attorney in his opening address to the jury were extremely prejudicial. (Tucker v. Henniker, 41 N. H. 317; People v. Fielding, 158 N. Y. 548; Stone v. State, 22 Tex. Cr. Tr. 185; People v. Wolf, 183 N. Y. 472; People v. Mull, 167 N. Y. 247; People v. Fielding, 158 N. Y. 542; People v. Bissert, 71 App. Div. 118; People v. Brooks, 131 N. Y. 321; People v. Greenwall, 115 N. Y. 520; People v. Davey, 179 N. Y. 345.) It was error for the court in his charge to characterize the cross-examination of Rose, and the charge was extremely prejudicial. People v. Barberi, 149 N. Y. 256; People v. Cignarali, 110 N. Y. 23.) The court erred in excluding evidence of opportunity on the part of the accomplices to confer with each other. (State v. Williamson, 42 Conn. 265.) The court erred in refusing to permit Rose to be examined on the newspaper article of which he was author and it was error to compel counsel to agree to the introduction of the original in evidence. (People v. Wolf, 183 N. Y. 477; People v. Davey, 179 N. Y. 345; Dunn

v. N. Y. Edison Co., 47 Misc. Rep. 603; Stone v. Mansfield, 27 Misc. Rep. 560; Phelps v. Morrisson, 13 Hun, 112; Brett v. Buckman, 32 Barb. 655; Bonesteel v. Lynde, 8 How. Pr. 226; Gaughe v. Laroche, 14 How. Pr. 151; Valiente v. Dyckman, 24 How. Pr. 222.) The court erred in curtailing and limiting the cross-examination of the principal witnesses. (Mead v. Shea, 92 N. Y. 125; Ritchy v. Pakas, 136 App. Div. 884; People v. Gibbine, 115 N. Y. 196; Becker v. Koch, 104 N. Y. 394; Wigmore on Evidence, 1363; People v. Patrick, 182 N. Y. 187.) Because of the methods employed to obtain the conviction and because of the attitude of the court during the trial, and because of the speed of the trial, the case should be reversed. (People v. Pattanza, 207 N. Y. 556; People v. Naimark, 154 App. Div. 762; Dreyer v. Ershowsky, 156 App. Div. 27.)

*Charles S. Whitman, District Attorney (Robert C. Taylor of counsel), for respondent.* The trial judge committed no error in limiting the cross-examination of Rose. The scope of such an inquiry is to be determined by the trial judge in his discretion. (G. W. Tpk. Co. v. Loomis, 32 N. Y. 127; White v. McLean, 57 N. Y. 670; Langley v. Wadsworth, 99 N. Y. 61; People v. Braun, 158 N. Y. 558; People v. Spencer, 179 N. Y. 408; People v. Barnes, 202 N. Y. 77; People v. Smith, 180 N. Y. 125; People v. Gillette, 191 N. Y. 107; People v. Poulin, 207 N. Y. 73.) A trial judge may comment upon the evidence, and may indicate his own opinions as to the guilt or innocence of the accused without danger of reversal, provided he unmistakably charges the jury that they are the sole judges of the facts and leaves all the qestions of fact to them. (People v. Sindram, 1 N. Y. Cr. Rep. 448; 88 N. Y. 196; People v. Fanning, 131 N. Y. 659; People v. Osmond, 138 N. Y. 80; People v. Leach, 146 N. Y. 392; People v. Smith, 180 N. Y. 125.)

Where alleged prejudicial matters are relied upon, the true question is whether the trial judge sufficiently protected the prisoner's rights by removing the effect of prejudicial statements. No matter what may have been the earlier actions of the trial judge, if the case was fairly submitted to the jury the verdict must be accepted as final. (People v. Hallen, 48 App. Div. 39; 164 N. Y. 565; People v. Poulin, 207 N. Y. 73.) Error cannot be predicated on the opening of the district attorney. (People v. Conklin, 175 N. Y. 333; People v. Doody, 177 N. Y. 165; People v. Wagner, 180 N. Y. 58; People v. Smith, 180 N. Y. 125; People v. Gillette, 191 N. Y. 107; People v. Poulin, 207 N. Y. 73; People v. Cummins, 209 N. Y. 283.) There was no error in the charge. Every question of fact was left to the jury. The charge is to be construed as a whole and not upon isolated extracts. (People v. Koenig, 180 N. Y. 155; People v. Johnson, 185 N. Y. 219; People v. Gilbert, 199 N. Y. 10; People v. Spiegel, 143 N. Y. 107.)

HISCOCK, J.

At about two o'clock in the morning of July 16, 1912, in one of the most public portions of the city of New York at such an hour, one Herman Rosenthal was shot to death in the street. While he was a gambler and lawbreaker, his murder aroused great public interest and excitement, *first*, because of the barbarous defiance of law displayed in the manner of his killing, and, *second*, because he was about to appear before a grand jury and give evidence to establish improper relationship between members of the police force in said city and unlawful resorts, and wherefrom arose the possibility for suspicion that the police had participated in or encouraged the murder.

I think the record and events of which we may take judicial notice permit it to be stated that this public interest and excitement were sustained and stimulated by daily newspaper reports,

apparently emanating from authoritative sources, that members of the police force were thus implicated and that clues were being followed which would lead to one " higher up " in the police force.  Soon these rumors were directed specifically at the defendant, who was a lieutenant of police in command of a squad especially coming in contact with gambling houses, and who had been named as a police " grafter " by Rosenthal in an affidavit published in the newspapers just before the murder, and first on July 29th and again on August 20th he was indicted for the murder.  He has been tried and convicted under the last indictment.

The underlying theory of defendant's guilt at the trial and upon this appeal which has been advanced by the prosecution and which, as we must assume, was approved by the jury is, briefly, as follows:

It is charged that in the fore part of the year 1912 defendant entered into a partnership with Rosenthal for the equipment and maintenance of a gambling house, one Rose participating in the undertaking as a representative of the defendant; that subsequently Rosenthal became enraged at Becker because of the conduct of the latter particularly in leading a raid on the house and breaking up his business, and thereafter sought to destroy Becker's standing and official character by approaching in turn the newspapers, the mayor, the police authorities and the district attorney with information of his unlawful relations to the gambling business; that Becker becoming alarmed by these attempts formed the purpose of having Rosenthal murdered, and secured promises of help to that end from three gamblers and criminals, Rose, Webber and Vallon, the murder compact between them being struck at a meeting held in a vacant lot in Harlem at night some time in June; that these last named individuals, after various delays and excuses, through the assistance of others who actually fired the fatal

shots, finally consummated the plan and procured the murder of Rosenthal.

It is to be well noted that in this theory there is no suggestion that defendant directly participated in the killing of Rosenthal, for, as was frankly stated in his very fair discussion of the facts by the assistant district attorney who argued the appeal, under the People's theory the defendant may have been a thousand miles distant from the scene of the murder when the crime was committed. But the claim is that the defendant accomplished the murder by proxy twice removed through enlisting the murderous help of Rose, Webber and Vallon, and that these in turn hired another set of individuals, known throughout the record as "gangsters" or "gunmen" who did the actual shooting; and that the complete conception of this scheme occurred at a meeting between Becker, Rose, Webber and Vallon in a vacant lot in Harlem on some indefinite date shortly before the murder.

Prompt preparations were made for the trial of the defendant. The governor appointed an extraordinary term for the trial of him and of others indicted with him, and designated Mr. Justice GOFF to preside thereat. The trial commenced October 7th, and after continuing for nine and a half court days, during which 3,000 pages of evidence were taken, the defendant was convicted and sentenced to death.

A limited review of the evidence on which he was convicted is essential to an intelligent consideration of the questions to be discussed on this appeal.

Notwithstanding the zealous efforts of the district attorney, who with most commendable promptness entered upon an immediate investigation of the crime, absolutely no testimony was given on the trial directly tending to connect the defendant with the murder by other than six witnesses. Without their support the People's case utterly fails. These gave evidence

of alleged conversations with Becker, either relating to the future commission of the murder, or containing admissions of complicity in its past commission, and because of their prominence and controlling importance for the prosecution, the character and situation of these witnesses merit careful consideration.

One of them, Luban, was produced for the purposes of the trial by the criminal authorities of a neighboring state where he was confined in jail on some conviction or charge whereof the nature does not appear. After being brought to New York and before going on the stand this witness, in a manner which we cannot but regard as significant, was given an opportunity for conference with Rose, the chief witness for the prosecution, and who was immediately to follow him upon the stand. Their was a degenerate lawyer and convict who also was temporarily evidence was entirely harmonious. Another witness, Hallen, delivered from jail to be a witness. In addition to the impeachment of their evidence furnished by their character and by the direct contradiction of other witnesses, much of the testimony of these men is, as it seems to us, inherently improbable and subject to suspicion.

Three of the other witnesses were Rose, Webber and Vallon, gamblers and lawbreakers, already referred to. Undisputedly they were guilty of the murder of Rosenthal. Soon after it occurred their complicity in hiring the men who actually killed him was established, and there was no question that they had forfeited their lives and were subject to the punishment of death. But they claimed that the defendant had instigated them to commit this dreadful crime, and by virtue of this claim they secured from the district attorney, with the consent of the court, as the stipulation recites, an agreement in writing giving immunity to them, conceded murderers, if they would furnish

evidence tending to convict Becker, who thus far had only been accused of the crime.

The remaining witness was Schepps, also a gambler and law-breaker, and the intimate of and more or less dependent upon Rose. While the presiding justice permitted the jury to find that Schepps was not an accomplice of Rose and the others and, therefore, guilty like them of the murder of Rosenthal, some of the members of court believe that that finding was opposed to the overwhelming weight of the evidence which showed his close relationship with and dependency upon Rose and his admitted presence at stage after stage of the conspiracy, his close proximity to the alleged Harlem conference, his help in assembling the gunmen, his presence at Webber's poker rooms with the other conspirators and murderers just before the crime was committed, and his companionship with Rose when the latter paid off the gunmen after they had shot Rosenthal.

He, too, was testifying against Becker under an agreement of immunity substantially similar in its effect to that which had been extended to the other conceded murderers, and thus we have these four witnesses acting under an agreement sparing the lives which admittedly in the case of three of them, and probably in the case of the fourth, were forfeited, provided they would give evidence to convict the defendant.

Having thus called attention to their character, and to the motives and inducements under which these witnesses testified, I shall not enter upon any extended analysis of their testimony for the purpose of reviewing the defects and inconsistencies which are charged against it by the defendant, referring simply to a few uncontradicted features.

All of the four witnesses last named testified concerning the alleged Harlem conference. Nobody connected with the prosecution or trial of the defendant has doubted that this conference was the very foundation upon which was built the theory of de-

fendant's guilt, for there it was that he, as claimed, definitely enlisted the aid of Rose, Webber and Vallon in the plan for the murder of Rosenthal, and in accordance with which such murder was finally consummated. It would be idle to discuss for a moment the guilt of defendant under the present prosecution unless this conference did take place. Yet not one of these witnesses is willing to fix with any definiteness the date when it occurred, although it must have been only a short time before the murder, and they are not able to agree with any precision on the hour when or the spot where it occurred.

While Becker on their theory was principal in, supervisor and importunate promoter of the plan to murder Rosenthal, the singular circumstance appears that for days before the murder was committed there was no personal conference between him and his agents, but the proposed murder was discussed openly and at times like an incident of subordinate importance between him and Rose over the telephone.

These witnesses in accordance with the terms of the immunity agreement were kept in confinement in a special place of custody and where, as the incomplete evidence which the defendant was permitted to develop indicated, ample opportunities existed for collaboration on the evidence they were to give under their life-saving agreement to convict Becker.

Outside of the evidence given by these six men, it is, to say the least, a grave question whether there is any testimony which under the test required by law corroborates them as to Becker's guilt of murder. There is other evidence which the jury were entitled to believe tending to show a relationship of defendant with Rosenthal in the gambling business, relations and communications between him and one or two of the conceded accomplices, and that he was a " grafter " so called. But to repeat, it is very doubtful whether such evidence, in the manner provided by law, corroborates the testimony of the witnesses

named in connecting Becker with the specific act and crime of murdering Rosenthal, and of course if this judgment of conviction is to be affirmed it must be done because defendant is guilty of murder and not because he was guilty of " grafting " or official misconduct, however iniquitous and despicable they may have been.

There are three other features of the People's case developed by its own witnesses which deserve mention and consideration.

It is urged that Becker's fear of Rosenthal's accusations furnished a strong motive for desiring the death of the latter and that this motive greatly supports the theory of the prosecution.

There is no doubt that evidence of motive for the commission of a crime may be important, although it is perfectly well settled that it does not of itself supply the necessary corroboration required by the statute. But the evidence of such motive in this case is not very satisfying. As has been pointed out, the People claim that the murder conspiracy was fully hatched at the Harlem conference, probably in June, and if the existence of that conference is not satisfactorily established the case against the defendant falls in utter collapse. Therefore, the inquiry becomes inevitable whether at that time Becker's fear of Rosenthal was sufficient to lead him to resort to the desperate remedy of murder. The evidence of the People answers this inquiry by showing that at this time Becker was fully advised of Rosenthal's movements; that the latter had failed to secure the ear of the newspapers or of any of the authorities for his accusations, and that in this respect conditions had not changed since, a short time before, Becker had expressed himself as quite indifferent to Rosenthal's efforts.

Again, during the few days intervening the publication of Rosenthal's affidavit accusing Becker of official misconduct, and the murder, all of the evidence, aside from that given by Rose

and his co-conspirators, shows that Becker was engaged in strenuous efforts to discredit Rosenthal and suppress evidence corroborating him before the grand jury. While, of course, this latter evidence is not conclusive, it does make one somewhat wonder why all these pains with a full-framed conspiracy pledged to remove Rosenthal before he could reach the grand jury. Certainly it does seem to be a case of defective logic to argue as is done elsewhere that Becker's zeal in trying to discredit and defeat Rosenthal before the grand jury is proof that he had at that very time arranged with some of the same agencies to murder him before he could reach the grand jury.

Various explanations, not altogether convincing, are given by Rose and his associates for the failure to execute more promptly at Becker's request the murder plan formed at the Harlem conference, and which it is said he was constantly and importunately insisting upon. Rosenthal's disclosures showing unlawful police protection of gambling were published on Saturday and Sunday. On the latter day the Sam Paul Association took an excursion, which was attended by some three or four hundred gamblers. Rose and his associates were in attendance, and Rosenthal's disclosures were a subject of universal discussion, in which it is quite needless to say that there was no expression of sympathy with Rosenthal. He was a " squealer," and whatever else happened the upheaval caused by his disclosures boded ill to the gambling fraternity and business. Rose, Webber, Vallon and Schepps were members of and identified with this body,' and some or all of them had personal grievances against Rosenthal. The excursion returned Sunday night, and almost within twenty-four hours Rosenthal was murdered, as it is said by the prosecution, under a plan formed by Becker some time in the preceding month, and which had then somehow languished until after this excursion. It is said by the defense that if the exact truth could be known it would

be found that the plan to murder Rosenthal was not formulated by Becker in a vacant lot in Harlem in June, but on the excursion of an enraged gambling fraternity a few hours before the killing occurred, and that Rose unintentionally gave illuminating evidence on this subject when he testified that in one of his alleged interviews with Becker he said: " I am going on the Sam Paul outing to-morrow and on it will be Webber and Vallon, and I will have a long talk with them and I am sure by the time I return some definite plan will be agreed upon amongst us to go after this thing (Rosenthal's murder) and get it over with."

If the Harlem conference ever occurred, as claimed by the People, it is urged that two other witnesses could have testified to it. Rose and his associates testify that they went there in two automobiles driven by chauffeurs. The journey from the starting point was several miles. Rose and Webber at least had attained a position of more than ordinary notoriety in their chosen spheres. Becker was certainly a prominent personage. The conference took place in a vacant lot at night—according to some of the evidence, late at night. It lasted a considerable time, and during it Schepps, according to his story, stood and conversed with one of the chauffeurs. This all occurred a comparatively short time before the murder and alleged disclosures implicating the defendant, and it would seem as though the chauffeurs must have remembered something of it. On the cross-examination of Schepps defendant's counsel persistently but unsuccessfully endeavored to learn the identity of these alleged chauffeurs. On the motion for a new trial it appeared, however, that during the trial their identity was disclosed to the district attorney, who procured their attendance at his office for investigation and examination, and then they were not produced on the trial. It was claimed by the People on the motion for a new trial that on such examination they simply declared

themselves unable to remember any such trip as the unusual Harlem one. The alleged chauffeurs themselves made affidavits absolutely denying that they ever drove to the alleged conference. Thus Becker stands condemned without any opportunity for a jury to hear these persons who according to Rose and his associates took them to the Harlem conference, but who for themselves solemnly aver in an affidavit that they never attended any such meeting, and it is urged that the mind of an appellate court should recoil from the proposition to take the defendant's life without hearing this testimony, which should go so far toward settling the question whether the primary event in the People's theory ever occurred.

On such evidence and lack of evidence, and also much testimony contradictory of it offered by the defendant, a jury has decided that Becker was guilty of the murder of Rosenthal and ought to be put to death. It is insisted by the defendant with all the earnestness possible that the People's evidence, independent of that offered by the defendant, is so impeached and discredited that it would not afford a safe basis for a judgment in an ordinary civil action and that much less is it sufficient to sustain a verdict which will result in taking a human life, and we are asked to set it aside as against the weight of evidence.

The law does cast upon us in such a case as this the burden and responsibility of deciding before permitting execution whether a verdict is supported by the weight of evidence. That, of course, does not mean that we are to take the place of the jury in passing upon those ordinary questions of the reliability of witnesses and of the credibility of testimony which constantly arise in trials or that we are to overturn the verdict simply because as an original proposition we might have reached a different result. It does mean, however, that we must say if that question should be reached whether, taking into account the undisputed and clear infirmities of the People's wit-

nesses and case, we believe that there is still left such a pre-
ponderating weight and balance of apparently worthy testi-
mony as justified the jury in finding that the affirmation of the
defendant's guilt was so unclouded by the shadow of any rea-
sonable doubt that the state would be justified in taking his
life.

While no one doubts that in the great majority of cases the
character and credibility of witnesses and the believeability of
testimony should be left to the final determination of a jury,
yet the fact that the statute imposes upon us the absolute duty
of deciding whether a verdict in a murder case is against the
weight of evidence would seem to make it equally plain that the
law contemplates the possibility that a jury may be swayed or
led into giving an unjust and unwarranted verdict and requires
us to correct the error when it does occur. Some of my asso-
ciates believe that the contention of the appellant is entirely
correct and that the present verdict should be thus set aside.
But since the consideration of that question might lead to a
difference of opinion amongst the majority members of the
court, I propose to pass it, expressing no view either way, and
proceed to the discussion of another proposition concerning
which there will and can be no difference of opinion.

In the presence of such dangerous and degenerate witnesses
as have been described and under all the conditions attending
and surrounding his case, the defendant certainly was entitled
to a scrupulously fair and impartial trial where nothing should
be done to prejudice his case or to obscure in the minds of the
jurors the elemental question whether the evidence justified
them in reaching the conclusion that he was guilty of the grave
crime with which he was charged. He was entitled to have his
counsel and case treated with that consideration which they
justly merited; that not only questions of law should be prop-
erly decided, but that questions resting more or less in discre-

tion should be reasonably disposed of; that, however uninten-
tionally, no spirit of hostility and of discrimination on the part
of the court should seem to be generated which would envelope
his case and permeate the minds of the jury as they listened to
evidence and arguments and as they finally came to decide the
momentous question of guilt or innocence.

We do not think that the defendant had such a trial. We
think that he suffered grievously from the erroneous disposi-
tion both of questions of law and discretion.

It is of course difficult to portray in an opinion the atmos-
phere which seems to have surrounded the trial of a long case.
This is produced by many incidents and events which can only
be appreciated by reading an entire record, and it would carry
an opinion beyond permissible limits to attempt to describe
many of these in detail. Even when confined to a summary and
illustrations it becomes burdensome in its length and yet this
much seems necessary and just to both sides as against a mere
statement of conclusions.

At the very opening of the trial there occurred an unfor-
tunate scene which fairly foreshadowed the relationship of an-
tagonism which was to prevail between the trial judge and de-
fendant's counsel. When the trial was moved an application
was made by the defense for an adjournment because of the
sickness of one of the leading counsel and concerning the good
faith of which application the district attorney expressly stated
that he made no question. This motion was promptly and,
very probably, properly denied. The defendant's counsel then
stated that he had another motion for postponement of the
trial on the ground that defendant could not obtain a fair trial,
upon which he desired to be heard, whereupon the following
colloquy took place:

" The Court: Have you embodied these matters in an
affidavit?

"Mr. McIntyre: Yes, sir, I recite my facts, and will commit them to an affidavit in an instant, but if you will hear me—

"The Court: I will not hear you.

"Mr. McIntyre: I desire to be heard.

"The Court: I desire that you be not heard upon this matter. If you have a motion supported by affidavit I will hear it.

"Mr. McIntyre: Will you indulge me one instant? * * *

"The Court: No, no, stop; nothing further; I deny your motion.

"Mr. McIntyre: Are we going to be forced to trial in the face of the statement made by the district attorney that Zelig (a 'gang' leader who had just been killed) was an important witness, when he knew he was not a witness to be called on behalf of the State? * * *

"The court: Let us understand each other at the commencement. This is a court of justice. It is not a place for the display of eloquence or emotion. * * *

"Mr. McIntrye: The orderly course of justice has been disturbed by the prosecution.

"The Court: *If you continue I shall be under the unpleasant necessity of directing the court officer to remove you out of court.*"

The incident complained of had occurred in the presence of the court, so that there was little need of an affidavit. Mr. McIntyre was the leading counsel for the defendant who bore the brunt of the subsequent trial. His client was on trial for his life, and this was the introduction of counsel to the panel from which the jury was then straightway selected.

In opening the case, notwithstanding the strenuous objections and exceptions of defendant's counsel, the district attorney committed the serious error of making many statements

either in words or to the effect that Becker was a " grafter,"
and was collecting blackmail and protection money from gam-
bling houses; that as time went on he became more avaricious
and bold and that his power became generally recognized by
keepers of illegitimate resorts; that he accumulated large sums
of money; that he had graft relations with gamblers; that he
was a " cool, calm, calculating, grafting police officer," and that
he used his office for the protection of " his traffic in the pur-
chase and sale of law enforcement."   It will be noted that these
statements were not confined to defendant's alleged relations
with Rosenthal preceding, and as claimed by the People, leading
up to the conspiracy to murder the latter, but were directed to
Becker's alleged general misconduct and corruption in no man-
ner connected with the alleged crime for which he was being
tried.   Sometimes the court stated rather mildly in answer to
the defendant's request that the jury be instructed to disregard
the statements of the district attorney, that he did not see how
they were relevant; sometimes the objection was overruled
altogether; sometimes he directed that the word " grafting "
be left out; sometimes he sharply criticised the defendant's
attorney for entering objections to the statements as they were
made.

It could not of course be competent and proper for the
prosecution to show as part of its case that Becker had been
guilty of general corrupt conduct having no possible relation
to the present crime. He was on trial for murder and not
general official misconduct and corruption.   And equally there
can be no doubt about the very prejudicial character of these
statements.   In its quest for motive the People's entire theory
of defendant's guilt rests on the allegation of " graft " in con-
nection with Rosenthal, and the repeated statements to the
effect that Becker's misconduct was not confined to Rosenthal
was not confined to Rosenthal but was habitual and flagrant

but was habitual and flagrant necessarily must have inflamed the minds of the jury. They present no vexed or uncertain question of error. While the courts are, as they should be, ready to make due allowance for some inadvertent slip made by zealous counsel in the heat and struggle of a bitterly contested trial, that consideration of course does not apply to the presiding judge, and no case will be found where there has been overlooked the failure or refusal of the trial court in a doubtful case like this to correct and check such important and repeated errors as these were. (People v. Fielding, 158 N. Y. 542, 14 N. Y. Crim. 34; People v. Wolf, 183 N. Y. 464, 19 N. Y. Crim. 460; People v. Conroy, 200 N. Y. 356, 369, 25 N. Y. Crim. 324.)

This much is practically admitted by the prosecution on the appeal and the only real answer attempted is that subsequently the defendant introduced in evidence a statement made by Rose to the district attorney wherein the former in giving a purported history of the alleged conspiracy to murder Rosenthal made accusations of extended corrupt conduct by the defendant in making collections from disorderly persons and that this cured the error. I do not think that this answer is sustained. This took place long after the statements of the district attorney had been made and allowed to sink into the minds of the jury and as a practical consideration the authoritative statements of the district attorney would be far different and more damaging than the unverified accusations of such a person as Rose.

But beyond this, as is more fully shown hereafter, the defendant's counsel tried to obtain this statement from the district attorney while Rose was on the stand solely for the purpose of cross-examination and impeachment and the court refused to direct the district attorney to produce it for that purpose as should have been done, to which exception was taken.

After this erroneous action on the part of the court, the defend-
ant's counsel did express a desire to put the paper in evidence,
manifestly for the purpose of contradiction and impeachment,
and finally through the action of the court he was forced into
an agreement before seeing it that if the district attorney
would produce the paper he would put it in evidence.   Under
such circumstances we think that the effect of the paper should
have been limited to the purposes and extent of contradiction
and impeachment for which defendant's counsel desired it and
that it should not be regarded as evidence in other respects for
the purpose of curing the error referred to.

The taking of evidence then commenced.

It may be stated very briefly but accurately that repeatedly
without any objection, complaint or request by the very able
and alert district attorney, the court on its own motion criti-
cized the defendant's counsel for some little peculiarity in the
form of his questions which was utterly innocuous; intervened
to protect the People's witnesses on cross-examination; ob-
jected to and excluded questions asked by defendant's counsel
and on one occasion when such counsel asked if the district at-
torney would concede a fact about which apparently there was
no dispute, the court ruled for the district attorney, " No, I
will not let him concede it."

At times on making an objection or asking a question, which
does not appear from the record to have been contumacious or
ridiculous, or on attempting to make a suggestion or give a rea-
son in what seems from the record to have been a respectful
manner, defendant's counsel was told that he was " becoming
trivial," and commanded to " sit down," or " Mr. McIntyre, you
know better than to object," or that " there is no necessity of
being so explosive about it," or " Now wait, stop that manner,"
or " You will save time by not indulging in so much talk," or
" No argument."   Perhaps in the interest of exactness we are

justified in quoting two passages, the first of which occurred on the cross-examination of the People's important witness Luban.

" The Court: This has been all gone over. I will declare this examination closed if there be no further question. The witness has been under cross-examination for two hours and a quarter.

" Mr. McIntyre: I can't help it, your Honor.

" The Court: It will be helped unless you put the question. No discussion at all. I have told you what I will do."

In the other case, when defendant's counsel addressed to the witness a question, the following occurred:

" The Court: How is that material?

" Mr. McIntyre: I am going to show that there was a conversation.

" The Court: Not what you are going to show.   *   *   *

" Mr. McIntyre: I wanted to show that there was opportunity to conspire and confer.

" The Court: *Come to order.* I shall not hear what you wanted to do. I will only hear questions.

" Mr. McIntyre: Your Honor asked me how it was material.

" The Court: I asked the *district attorney.*"

The district attorney had taken no part in the incident.

At other times haste seemed to become the essence of the trial and defendant's counsel on asking some question or requesting some not unusual indulgence were harshly admonished to " get along " or " go along," or " time is too precious."

On one occasion when the leading counsel for defendant pleaded weariness and asked that his associate might take his place in the cross-examination of a witness, the request was summarily denied. On another occasion it was proposed as an apparent reason for denying counsel's request for an adjournment that the cross-examination be turned over to his associate.

With one exception, so far as we are able to discover, every

appeal by defendant's counsel to the discretion of the court for an adjournment, for the very common leave to reopen the examination of a witness in order to correct some inadvertent omission or utilize on cross-examination of a hostile witness some newly-acquired information or to call a witness who had been absent was denied, whereas applications of a similar character on the part of the People were quite uniformly granted.

A witness named Shea was an important one for the defense, and he was cross-examined at considerable length by the People. At the close of such cross-examination the following occurred:

"Mr. Hart (defendant's counsel): I just want to ask one question.

"The Court: No. Call your next witness.

"Mr. McIntyre: We desire to call the witness for several questions.

"The Court: I shall not permit you. Time is too precious."

It was no exception that the district attorney, without objection or criticism, was allowed a redirect examination of his witnesses.

At the close of the original examination of Schepps the following occurred:

"Mr. McIntyre: I don't think I can conduct the cross-examination any further on the main issue. I am too exhausted. I am too tired.

"The Court: Let us have no more about exhaustion. We have heard enough about that.

"The Court: * * * Have you another witness waiting, Mr. District Attorney?

"Mr. Whitman: Mrs. Rosenthal has been waiting all day. * * * She appears to be exhausted. I will call her if your Honor thinks best. Her examination will take some time.

"Mr. McIntyre: I join in the request. Won't your Honor please adjourn to-night?

"The Court: Yes."

On some occasions the adverse rulings of the trial judge passed beyond the limits of discretion and were erroneous as matter of law. On the cross-examination of Vallon, one of the confessed accomplices and murderers, he was asked about the immunity agreement which had been executed with the district attorney, and was quite meagre and inaccurate in his evidence about it. Thereupon the district attorney was asked, and declined to produce it unless ordered so to do by the court, and the court refused to so order. Of course it was proper to show on the cross-examination of this witness that he was testifying against the defendant under an agreement that in consideration of so doing he should be turned free, and if possible wring from him some admission that his testimony was influenced by this great reward, and for the purpose of such cross-examination defendant was entitled to have the written agreement produced and to have the court so direct its officer, the district attorney. An attempt to conduct a cross-examination based upon its provisions without production of it would have been futile, and speedily would have been forbidden by the court.

It cannot be said that this error was corrected, because long after Vallon had left the stand and the opportunity for such cross-examination had passed the court did direct that this agreement be produced, and it was placed in evidence by defendant's counsel.

A somewhat similar occurrence took place on the cross-examination of the People's witness Schepps. After the murder Schepps fled to Hot Springs, Arkansas, and subsequently the defendant took the evidence of various apparently reputable people there concerning statements and admissions by him

which seriously impeached the testimony which he gave for the People. Those commissions had been returned and were sealed and under the control of the court at the time of the trial, and on the cross-examination of Schepps the defendant's counsel repeatedly urged that the court should order them opened so that reference might be made to the evidence of these witnesses for the purpose of framing exactly, as was necessary, questions to be put to Schepps as a basis for the impeaching testimony. This the court refused to do unless counsel would agree to read the commissions in evidence. The request of counsel was a reasonable one and in the interest of expedition. The ruling was objectionable, and even if it be true that finally the trial judge with a somewhat labored explanation did reverse his action, and counsel secure the benefit and use of the commissions as requested, that does not eliminate the appearance of unnecessary embarrassment and obstructions imposed upon him in the trial.

Again, on the cross-examination of the People's witness Rose, it developed, as has already appeared, that he had prior to the trial prepared and given to the district attorney a statement or confession relating to his participation in the murder, and of which a purported copy had been published in the *World*. Defendant's counsel tried to utilize the latter for purposes of cross-examination, but on the objection of the district attorney this effort was stopped. He then asked the court to direct the district attorney to produce the original for purposes of cross-examination of Rose. This the court declined to do, and it was not until several days after Rose had left the stand that defendant's counsel obtained from the district attorney this paper after he had been forced, as we think it may fairly be said, by the latter and the court into an agreement before seeing it to put it in evidence as a whole, and the court had even gone to the extent of formally compelling the defendant's attorney to modify his description of it " as a confession or state-

ment to the district attorney," so as to conform to what seemed to be the somewhat sensitive desire of the latter to have it known as " a paper."

Rose, Vallon and Schepps were confined in a special place of detention pending the trial. They were engaged in the common undertaking of attempting to save their own lives by placing in forfeit that of Becker. As a matter of common sense there can be no doubt that it was important to know whether they were in constant communication with each other, and as matter of law there can be no doubt that it was proper to show this on cross-examination of any one of them. The exclusion of such evidence was error of law, and on such a plain and important point it is no answer to say that somewhere else in the case there appeared some evidence from which a jury might conjecture the existence of opportunity for conference and collaboration. The defendant ought to have been allowed to examine fully, pointedly and without embarrassment each and every one of these conceded conspirators concerning the time they had spent in fashioning a harmony of evidence by which they sought to convict him.

The trial judge assumed what seems to us to have been a different attitude toward different witnesses. One called by the People, like Ryan, who apparently failed to give expected or satisfactory evidence, and another like Reich or Sullivan, who gave testimony in behalf of the defendant, were treated with considerable harshness, even considering all of the latter's alleged defects, and subjected to examination and admonition by the court which plainly implies to our mind the intimation as it must have to the jury that they were committing or were liable at any moment to commit perjury. On the other side was the witness Schepps who after various negotiations returned from Arkansas with an assistant district attorney for the purpose of being a witness against Becker. There can be no pos-

sible question concerning the character of this man or concerning the extent to which the truthfulness of his evidence as a whole was impeached. On his cross-examination the court volunteered to inform him that he might decline to answer certain questions on the ground of privilege; he was excused by it from answering directly certain questions which it was proper should thus be answered and he was allowed to insult the defendant's counsel without rebuke while the defendant's counsel was sharply admonished that he must give the witness fair treatment.

In the cases of at least four witnesses questions asked by the defendant's counsel were excluded or the examination terminated, the exclusion in some cases being accompanied by the peremptory refusal of the trial judge to hear any argument or explanation and then the witnesses were subsequently recalled by the district attorney on his own motion or on the order of the court and the defendant's counsel permitted, and, when he declined so to do, the district attorney ordered for him to put the questions which had been thus excluded. Apparently the court considered that substantial error had been committed, as it certainly had, in the exclusion of some of the questions and by this unusual and, for the defense disadvantageous method, the attempt was made to cure the error. It does not seem to us to be contumacious conduct or to evidence an undue struggle to secure exceptions that under the circumstances of this case long after a witness had been dismissed and the connection of his evidence lost, counsel should refuse to relieve the court from any error which may have been committed, by bringing in evidence which had been improperly excluded, and which then had lost its value for the defense.

Rose, in addition to being a professional lawbreaker and one of the conceded murderers of Rosenthal, who had procured immunity from the death penalty by agreeing to give and giving evidence to convict Becker, was apparently a person of quite su-

perior intellect and shrewdness and was especially relied on by
the prosecution to sustain its theory and fasten the charge of
murder on the defendant. He was described by the trial judge
as "manifestly the most important witness for the prosecu-
tion." He was the first one of the conceded conspirators and
accomplices to be placed on the stand by the prosecution and
the others closely followed the line of evidence given by him.
His direct examination by the district attorney commenced with
the opening of court at ten o'clock and continued with a short
intermission for luncheon until 2 : 30 in the afternoon and was of
the most important character, covering a very wide range. He
was then taken by the defense for cross-examination which was
continued without break or request for indulgence until after
six o'clock, when a request was made by defendant's counsel for
an adjournment which was quite peremptorily refused by the
court with the closing remark: "Mr. McIntyre, we will have
no further discussion about the matter." The question came
up a second time, when in answer to the rather harsh criticisms
of the court concerning his failure to understand some evidence
defendant's counsel protested that he ought not to be subjected
to criticism in view of the extraordinary endurance strain to
which he was being subjected. Finally, at half-past eight, after
having been in court for ten hours and a half with only a short
intermission, defendant's counsel asked for an adjournment in
order to get something to eat. The court having refused this
request and again criticised the counsel, he started to continue
his cross-examination, but after asking a few questions stated
that he was physically unable to continue the examination and
requested an adjournment. The court with fresh criticism
stated: "No good reason whatever appears for an adjourn-
ment. There yet remains three hours. Counsel may have
them." And after some further colloquy in which defendant's
counsel protested that he desired to ask further questions but

was physically and mentally unable to do so, the court declared
the cross-examination closed and dismissed the witness.    At
the time this occurred the witness had not been cross-examined
at all concerning the Harlem conference and only meagerly con-
cerning the Sam Paul excursion and possibly other matters.
The adjournment finally occurred at 8:50 o'clock Saturday
evening after the court had been engaged in the trial with long
sessions since the preceding Monday morning, and during which
the same counsel who was cross-examining Rose had been bear-
ing the heavy burden of the trial for the defendant.

Subsequently the trial judge to justify his course stated that
it was in the interest of justice and for the benefit of the jury,
the defense and the prosecution that the entire examination of
Rose should be concluded at one continuous session.   " There
should be no break; there should be no opportunity for him to
re-create a story if it was false."

It seems quite unnecessary, as the result of the most ordinary
experience, to discuss the proposition that a jury, unaccus-
tomed to any such confinement, at the end of a week would be
able beneficially to concentrate their interest and attention on
the examination of a witness after it had been continued for ten
hours.   It is sufficient to say so far as the defense is concerned
that it did not request any such purported protection from the
trial judge as he was giving, but, on the other hand earnestly
protested against it.   Therefore, the prosecution alone must
have derived any benefit resulting from this course and the
question is, was it justified?

It is to be admitted of course that the duration of exami-
nation of a witness must be to a considerable extent under the
control of the trial judge and that he has the power if it is un-
duly and uselessly protracted to finally place a limit upon it.
The cross-examination of Rose was continued through six
hours, but it is to be remembered that his direct examination by

the district attorney who was fully advised what to ask him occupied nearly four hours; that a cross-examination of an astute and unscrupulous witness to be of any value cannot proceed with the directness which should characterize a direct examination, but of necessity must often approach a subject, in an indirect and roundabout manner, and, moreover, that during the final two hours Rose's cross-examination was conducted by counsel after he protested that he was exhausted and was begging for indulgence and an opportunity to procure food.

But, beyond all this, it is perfectly clear that the mere loss of time in the examination of this witness was not the important consideration with the trial judge. The day before, although the hour of adjournment had not arrived, court was readily adjourned at the request of the district attorney on the announcement of his purpose next to call this witness. Even then, although it was evident that the witness would be a most important one and that his examination would be protracted on both sides, the court gave expression to his unconditional determination that the examination of the witness must be concluded in one day. And, again, when the adjournment on Saturday finally took place, the trial judge indicated that the defendant's counsel might continue his cross-examination for three hours more if he desired, but that it must be closed that night.

Thus we find the controlling purpose of the trial judge not economy of time or duration of examination but the determination that the defendant's cross-examination should be closed on the same day as the direct examination, and we must rely somewhat on conjecture for an explanation of the ultimate and precise reasons which induced him to take this view of his duty.

It is earnestly insisted by the defense that the purpose was to prevent it from having an opportunity to cross-examine

Rose after examining and considering during the adjournment his evidence on the direct examination for the purpose of detecting weaknesses and inconsistencies therein, and thereby becoming better enabled to force him to " re-create " his story; also that it permitted Rose, with his cross-examination fully completed, to return to a conference with Webber, Vallon and Schepps who immediately followed him upon the stand and thereby more surely secure full and complete accordance in all of their evidence.

It is unnecessary to consider this claim of the defendant and whether the trial justice may have been influenced by any such consideration.    I assume for the purposes of this discussion that his rulings were inspired by motives which he deemed to be praiseworthy and in the interest of justice.    But nevertheless and however commendable these may have seemed, in determining whether his rulings were erroneous and injurious to the defendant it becomes necessary to consider what the results of them were, and I am obliged to confess that the substantial and apparent consequences were those suggested by the defendant.

Rose was concededly the most important witness of the People.    If, as claimed by the defense, a wicked conspiracy was framed by him and his associates to throw upon the defendant the responsibility for Rosenthal's murder and thereby secure immunity and save their lives, Rose was clearly the inventor and chief promoter of this conspiracy.    He was not only in custody but under the supervision of the district attorney's office and, therefore, there was no danger that he would be spirited away or tampered with during an adjournment even if any one had been willing to engage in such an enterprise, which we do not at all assume.

The most apparent danger was the one of a shift or " re-creation " in his evidence which seemed to affect the mind of

the trial justice. This danger if it existed was one which threatened the prosecution. No " re-creation " of his story was a source of danger to the defendant, for no matter what form it took, an inability or unwillingness on the part of Rose to tell upon cross-examination after adjournment the same story which he had related upon his direct examination would discredit him and inure to the benefit of the defense. We do not think that it was the duty of the trial justice to protect the prosecution against this danger by any such unusual course as was pursued. The defense should have had an opportunity for a searching, complete and advantageous cross-examination of Rose such as was not afforded at the end of long and unusual hours when counsel was exhausted mentally and physically. We think that the ends of real justice in a case where a man's life was at stake were not promoted but rather were defeated by a course which prevented such a cross-examination even though it should have disclosed additional weaknesses and defects in the witness' testimony which would have made it inadequate to sustain as a corner stone that burden of the People's case which was imposed upon it.

Whatever complaints may have arisen concerning other feature of trials, there has not been, so far as I am aware, any disposition to criticise or curtail the opportunity for a full and satisfactory exercise of the right of cross-examination and concerning which it has been written by a distinguished authority: " Cross-examination is a distinctive and vital feature of our law. For two centuries past the policy of the Anglo-American system of evidence has been to regard necessity of testing by cross-examination as a vital feature of the law. The belief that no safeguard for testing the value of human statements is comparable to that furnished by that of cross-examination and the conviction that no statement (unless by special exception) should be used as testimony until it has been probed

and sublimated by that test, has found increasing strength in the lengthening years." (Wigmore, § 1363.)

It is perhaps unnecessary to have spent so much time in discussing this unfortunate incident because of what was subsequently done by the court and district attorney and which practically amounted to a confession of error. At the close of the People's case and after Webber, Vallon and Schepps had all been sworn and testified in harmony with Rose and after various other witnesses had been called and several days had elapsed, the assistant district attorney recalled Rose for the ostensible purpose of asking a few not very material questions, most of which, without any struggle on his part, were ruled out by the court. After this Rose was tendered to the defendant " for further and complete cross-examination " subject to the permission of the court. The court very graciously and promptly permitted, but the defendant's counsel declined to accept, the tender. It is, however, urged that this permission cured the error of the course originally pursued by the trial justice. It is difficult for me to see how this argument can be made seriously.

It very often may happen that an error of the trial court in excluding some limited and well-defined piece of evidence may be fully and fairly corrected by a reconsideration of his ruling and the admission of the evidence. But that is not at all this case. Any cross-examination of Rose had for its object the impeachment of his evidence as an entirety. Days had elapsed since he had left the stand during which his evidence had been permitted to lie in the minds of the jury, and hundreds of pages of evidence of other witnesses had been given. His associates had followed him upon the stand and completed their testimony. It is fair to assume that the district attorney had warned him as his principal witness that the offer would be made to permit his further cross-examination. Nothing

indicates that the counsel for the defense had received any such notice of what was to be done and thus given any opportunity to prepare for it. As has been stated, the prior examination had occupied ten hours and filled hundreds of folios. The court doubtless would have forbade any further cross-examination which covered ground already traversed, and on the other hand it would have been practically impossible for counsel to remember all that had occurred. Under such circumstances the hour for profitable cross-examination by the defense had passed. All connection had been lost. The attempt to exercise it would have been profitless, and the only important result would have been to cure the errors of the court by sacrificing the rights of the defendant, and this course we do not think that defendant's counsel was called upon to pursue.

In his charge at the close of the trial the presiding judge defined with accuracy many of the principles of law which governed the jury in their consideration of the evidence and in the disposition of the questions of fact. He then outlined in much detail and most effectively the claims of the prosecution and the evidence which had been produced to support those claims, leaving it to the jury, with few and meagre exceptions, to evolve from their own unaided memories the recollection of any arguments or evidence in behalf of the defendant which tended to contradict and rebut such arguments and evidence of the prosecution. In his extended remarks concerning the witness Rose and which seem to us to have assumed somewhat the form of an argument in favor of his credibility, no attention is called to the fact that he had saved his own life by agreeing to give evidence against Becker; no reference is made to that aspect of the case so vigorously urged by the defendant that he and his associates had framed and were testifying under a conspiracy to convict Becker for the purpose

of saving themselves and that the harmony of their testimony might be the result of such conspiracy rather than proof of truthfulness; no reference is made to any of the many witnesses called by defendant to contradict the People's evidence.

In People v. Fanning (131 N. Y. 659, 663, 8 N. Y. Crim. 363) was thus written by Judge PECKHAM on the subject of marshalling the evidence by the judge in his charge in words which we think are sufficiently pertinent to render any comment unnecessary. He said: " In a criminal case we think the judge has the right, and indeed it is his duty to present the evidence to the jury in such light and with such comments that the jury may see its relevancy and pertinency to the particular issue upon which it was admitted, and thus be better qualified to appreciate its character and weight and to determine its credibility. These questions are for the jury, but it is proper that a judge should assist the jury in marshalling the evidence so that they may the more readily and intelligently come to a conclusion which shall be satisfactory to themselves, consistent with the evidence and in accordance with the law. *The judge should do this in a fair and impartial manner, having due regard to the rights of the defendant and with a serious and anxious desire for their preservation.*"

As was anticipated, we are quite aware at the end of this statement of some of the occurrences and rulings upon this trial that it does not adequately or satisfactorily reproduce the impressions which have been created by a study of the entire record and yet it will perhaps sufficiently for the purposes of this opinion illustrate and indicate the attitude of the trial judge toward the defense and which was in marked contrast with the harmonious relations which prevailed between the court and the prosecution.

It may be freely admitted that some of these occurrences and rulings considered simply by themselves are not of great

importance and might be disregarded even in this case. Still others of a more important character considered by themselves would probably be disregarded in a case where the evidence of guilt was so clear that we could conscientiously and honestly believe under the obligations imposed upon us that justice had been done in spite of them, for there need be no doubt that in a case of clear and manifest merits this will exercise the power conferred upon it and disregard errors which in its opinion have not interfered with the ends of justice. It has done this so repeatedly and uniformly that no citation of authorities is necessary.

But we are not thus considering these occurrences and rulings singly or in groups of two or three and we are not considering them in a case of clear and convincing merits where, for instance, there is no question concerning the homicide by the defendant and where reliable evidence leaves little chance for doubt concerning the existence of those other elements which enter into the crime of murder. We are considering them as an entire series in a case where proof even of a distant connection by the defendant with the actual homicide rests upon the testimony of degenerates and criminals, a majority of whom had made a bargain to save their own lives by helping to swear away that of the defendant and in whose characters nobody has at any time claimed to discover any trace of such conscience or moral sense as would be any more bounden by their oaths as witnesses than by the blowing of the wind.

Under such circumstances we are unwilling to say either that these rulings as a whole did not involve substantial error or that it is so clear that the defendant should be executed that they may be disregarded. On the contrary, we believe that the very opposite of these propositions is true; that these errors, certainly in the aggregate, are so substantial and seri-

ous that they ought not to be disregarded and the defendant sacrificed. (People v. Greenwall, 108 N. Y. 296, 302; People v. Fielding, 158 N. Y. 542, 550, 14 N. Y. Crim. 34.)

So far as these erroneous rulings involved questions of law it is unnecessary to discuss them at greater length for the principles applicable to their consideration are familiar.

So far as concerns rulings upon questions ordinarily classed as discretionary, let it be distinctly said that we have not been unmindful that a trial judge may inadvertently err and should have a fair opportunity to correct his inadvertence, and that such a judge must and should be invested with large powers of discretion and authority to the end that the trial may proceed with order and justifiable expedition to its final conclusion. If it be at all necessary specifically to recognize and reaffirm these principles, we do so.

Neither do we overlook the argument in this connection that in this case the defendant's counsel took several hundred objections and that whatever discretion was exercised against him by the presiding judge was but just repression and condemnation of methods which were obstructive and unwarranted. As we look at the record in the deliberate and undisturbed examination of an appeal we can readily perceive that the counsel made technical and useless objections and unnecessarily repeated them, and for that we have no commendation. But it must be admitted in extenuation of his conduct that the perusal more than once of this long record fails to disclose a single occasion when he appears to have been contumacious or intentionally disrespectful to the court, and it at least is not remarkable or unusual if zeal for his client, the complexity of legal questions arising in proof of conspiracy, the discredited and abandoned character of some of the witnesses being sworn against him, a sense of great responsibility, fatigue and nervous strain incidental to long hours and

the appreciation perhaps of a pervasive atmosphere of hostility led him to decline to make concessions towards the conviction of his client and to take technical and superfluous objections and to indulge in cross-examinations which may now seem tedious. But of course it is not and will not be claimed that these errors were a reason for denying to him and to his client on trial for his life those rights, whether of law or discreation, to which they were reasonably and fairly entitled.

The rule of discretion to which we have referred as abiding with a trial judge rests for its foundation upon the conception of a judgment exercised at every stage with open mind, fairly and impartially and in the interest of exact justice between People and accused, and when we find extending throughout a trial a series of rulings so repeatedly and consistently adverse to one side even upon reasonable requests as to indicate that the trial judge has yielded, however unconsciously, to a feeling of hostility and, with whatever praiseworthy motives, to the thought that presumptively justice will be best subserved by generally and constantly denying the requests of one side, we must conclude that there has been a loss of that open-minded discretion and well-balanced judgment which the law contemplates, and the party who has been injured by such abandonment is entitled to relief. It is at once a compliment and a heavy responsibility, the influence which an able and forceful trial judge may exert in a case of life and death on the minds of jurymen who are alert to discover the impressions produced upon his more experienced mind by the course of the trial, and when his attitude, although unintentionally, seems to portray hostility to and disapproval of one side there must necessarily result an impairment of that free and unbiased verdict which under our system of jurisprudence is regarded as essential to the administration of justice.

The fundamental demand of our law is that the accused shall have a fair trial, and that if that right has been infringed, not in respect of mere technicalities but in substantial matters, and however undesignedly, he shall have another opportunity to meet his accuser and establish his innocence. That in our opinion is the present case. Under the rulings of the court the defendant did not have that manner of trial which the law guaranteed to him. His counsel was hampered and embarrassed; his case was discredited and weakened; full and impartial consideration by the jury was impeded and prevented. He never had a fair chance to defend his life and it would be a lasting reproach to the state if under those circumstances it should exact its forfeiture. (People v. Wood, 126 N. Y. 249, 269; People v. Barberi, 149 N. Y. 256, 12 N. Y. Crim. 423; People v. Davey, 179 N. Y. 345, 347, 18 N. Y. Crim. 528; People v. Wolf, 183 N. Y. 464, 19 N. Y. Crim. 460; People v. Freeman, 203 N. Y. 267, 271; People v. Kinney, 202 N. Y. 389, 397, 26 N. Y. 143.)

The principle of what was written by Judge WERNER in the *Davey* case, although said under other circumstances and in the case of a different crime than murder, is cogently applicable. The case was one where from the nature of the offense charged some of those feelings of popular prejudice and passion were liable to be aroused which it is contended were not lacking in the present case. He wrote: "There are cases, however, in which apparently technical errors may be so prejudicial as to produce the gravest injustice. This may be particularly true of a case in which a defendant, accused of an abhorrent and detestable crime, finds himself confronted at the very threshold of the court room, with that subtle, pervasive and almost ineradicable prejudice which the bare charge of such a crime may engender against him, in the minds of those who are to pass upon his guilt or innocence.

\* \* \* In such cases reason needs to be safeguarded from prejudice by everything that caution and justice can suggest \* \* \* so that jurors may, as far as possible, be unbiassed and impartial."

And as was again said by Judge VANN in People v. Wolf: " An unfair trial, especially in a criminal case, is a reproach to the administration of justice and casts grave responsibility not only upon the prosecuting officer but also upon the trial judge. However strong the evidence against the defendant may be, if she did not have a fair trial, as shown by the rulings of the court \* \* \* the judgment of conviction should be reversed and a new trial ordered so that she may be tried according to law." (p. 472.)

The judgment of conviction and order denying a new trial should be reversed and new trial granted.

MILLER, J. (concurring). I concur with my brother HIS-COCK. The conduct of the trial was grossly unfair to the defendant. Indeed, it is impossible to portray in an opinion the spirit of unfairness which pervades the record from cover to cover. A careful reading of it has created, and subsequent study has strengthened, the conviction in my mind that the verdict was produced by the compelling influence of a forceful judge, whose prejudgment of the cause had unconsciously created a predetermination to convict the defendant. In my opinion it would be a reproach upon the administration of justice to allow the verdict to stand. But I reach that conclusion for the additional reason that the verdict is against the weight of the evidence, and, although a majority of the court do not consider it necessary to pass upon that question, I am impelled by the dissent of my brother WERNER to state my view of the facts.

At the outset, I deny that the verdict of the jury forecloses

consideration by us of the character and credibility of witnesses or of controverted questions of fact arising upon conflicting evidence. The answer of the learned district attorney to the appellant's argument on the facts is that the jury believed the People's witnesses, and we are cited to many opinions of this court containing general expressions which, it is claimed, establish the rule that in case of a conflict of testimony we are powerless to review the facts. Those statements mean only that this court will not interfere with the verdict of a jury on a mere question of the credibility of witnesses. Otherwise, we should be limited to a review of the question of law, whether there is any evidence to support the verdict, although the statute (Section 528 of the Code of Criminal Procedure) says: "When the judgment is of death, the court of appeals may order a new trial, if it be satisfied that the verdict was against the weight of evidence or against law, or that justice requires a new trial, whether any exception shall have been taken or not in the court below."

The last statement of this court on the subject is found in an opinion of the present chief judge, concurred in by the entire court, viz.: "The case resolved itself into a question of credibility, and there is nothing in the record to indicate that the jury passed upon that question incorrectly. The fact that a jury in a criminal case has chosen to believe one set of witnesses rather than another set, upon an issue where the conflict between them is irreconcilable, affords no ground in and of itself for interfering with the verdict. (See People v. Ferrara, 199 N. Y. 414.) To justify a reversal on the facts under such circumstances, the appellate court must be able to detect some reason why the version which has been adopted by the jury should have been rejected." (People v. Poulin, 207 N. Y. 73, 78.) Why, then, should the version adopted by the jury in this case have been rejected?

My brother WERNER has narrated the facts, as claimed by the People, which he thinks tend to establish the defendant's motive for the crime and his participation in its commission. Although the evidence relating to them presents a mass of contradictions and inconsistencies, I shall assume for the purpose of this discussion that the facts thus narrated are established. They do not singly or together tend to connect the defendant with the commission of the crime. They do furnish ground for argument on the question of motive, and they do show the defendant's relations with Rose and the latter's relations with the " gunmen." Proof of motive is always of great importance, but it is a novel proposition to me that such proof in and of itself tends to establish the defendant's participation in the crime or supplies the corroboration of accomplices which the law requires. (See People v. Ledwon, 153 N. Y. 10, 20.) The record bristles with inconsistencies and contradictions on the main facts, which I shall not take the time to discuss, as I propose to confine myself to matters which are either uncontroverted or are testified to by the People's witnesses. My proposition is that the case made by the People will not stand analysis.

It will clarify the discussion to remove from the case an atmosphere inimical to the defendant, which has surrounded it from the start, and which the People's principal witnesses cunningly and insidiously injected into it at every opportunity. That atmosphere has been created for the most part by three assumptions directly contrary to the conceded and established facts, viz.:

1. That the publication in the New York *World* on Sunday, July 14th, 1912, of Rosenthal's affidavit containing charges against the defendant actuated the latter to commit the murder.

According to the People's theory the murder plot was fully

matured, so far as the defendant's participation was concerned, weeks before that publication.

2. That the place and manner of the homicide, and the temporary escape of the murderers, suggest police complicity.

There is no pretense that the defendant knew when, where or how the crime was to be committed.

3. That the " gunmen " were actuated to do the deed by the command and under the promise of protection of some one " higher up."

There is no pretense that the defendant had any relations whatever with the gunmen, except that the People charge that he caused their chief to be twice arrested by means of a so-called " plant." But the fact established by the People is that the " gunmen " did the deed for pay, $1,000, which was furnished, not by the defendant, but by Webber, the People's chief witness next to Rose. My brother WERNER is in error in saying that the record discloses no connection between the " gunmen " and the gamblers. There is ample evidence of an intimate association between them, which I shall not discuss further than to call attention to the evidence relating to Sam Paul and his association; to the fact that Rose and Webber furnished bail for Zelig; to the fact that Rosenthal himself had used men of that character on former occasions to injure Webber and Vallon, or at least so they thought, and to the further fact that, according to his own story, Rose was in communication with the " gunmen " before the defendant even said a word to him on the subject of murdering Rosenthal.

It will now be useful to determine precisely what is essential to sustain the verdict. In the last analysis the case in its legal aspects rests on the testimony of Rose, Webber, Vallon and Schepps, to a very slight extent corroborated by Hallen and Luban. I have carefully analyzed the mass of evidence on collateral issues. Its volume compels me now to content myself

with the dogmatic assertion that, except for the testimony of the witnesses named, there is not a particle of evidence in the record tending to connect the defendant with the commission of the crime. I am spared the necessity of discussing the evidence showing the worthless character of Hallen and Luban, their motives, the inherent improbabilities of their testimony, the contradictions by other witnesses, the established perjury of Luban, and the conflict between him and Rose on a collateral matter, tending strongly to discredit both, and indeed to cast suspicion on the whole case, because we are all agreed that, as a matter of fact, if not of law, a finding that Schepps was not an accomplice is essential to the People's case.

I now roughly sketch the story of the crime as narrated by the People's witnesses. At some time not named, possibly as early as May, the defendant employed Rose to employ the " gunmen " to murder Rosenthal. Rose visited them and told them what the defendant wanted. They readily assented and offered to do the deed at once, but Rose said to wait and to hold themselves in readiness to respond to his call, to which they assented. The next day Rose reported what he had done to the defendant. He continued to visit the " gunmen " two or three times a week, to use his words, " always instigating them to kill Herman," although they had been ready from the start to do it on notice from him. Rose delayed the execution of the plot because as he says he was " between two fires," the defendant and the " gangsters," and hoped that the murder would not be necessary. The defendant, becoming impatient and thinking that the " gunmen " might have confidence in Webber, asked Rose to enlist the latter's aid, and appointed a meeting in Harlem, on a date not named, but probably in June. Rose and Webber kept the appointment, taking Vallon and Schepps, whom the defendant did not expect and knew but slightly. Nothing was planned and nothing done at the meet-

ing except that the defendant, in the presence of Vallon, requested Webber to aid Rose to do what the latter had already done, namely, to persuade the " gunmen " to murder Rosenthal, and Webber consented. Schepps remained where he could see them but could not hear the conversation. Following that meeting, the defendant held no communication whatever with the conspirators and did nothing in the furtherance of the murder plan except that he met Webber alone on the street once and inquired why he didn't see that Rosenthal was " croaked " and except that he had daily conversations on other matters with Rose, usually over the telephone, in the course of which he invariably complained of the delay in murdering Rosenthal and asked that it be done speedily. On Sunday, July 14th, the New York *World* published Rosenthal's affidavit. Some allusion was made to the matter in the paper on Saturday. At any rate, it was known on Saturday that the affidavit was to be published the next day, and the district attorney issued subpœnas for Rosenthal, Rose and others in the underworld to appear before the grand jury the following week. On Sunday Rose, Webber, Vallon and Schepps went on the Sam Paul outing, where the chief topic of conversation was Rosenthal's " squeal." On their return to the city, Rose called the defendant on the telephone to report to him the sentiment of the gambling fraternity. On Saturday and on Monday, the last time toward evening, the defendant called Rose on the telephone at a public bath, which the latter frequented, to get him to assist in various ways in the effort to which the defendant was directing his energies to discredit Rosenthal, to destroy the effect of his story and to induce witnesses not to corroborate him before the grand jury. In each conversation the proposed murder was incidentally referred to, as it was on Sunday night, and the request which the defendant had been repeating over the telephone daily for weeks was made that the job be done.

About two o'clock Tuesday morning, July 16th, the murder was committed.

The story itself is grossly improbable and it is related by four men of the vilest character to save their own lives. I admit that those considerations are not controlling. Improbable crimes are committed, and the People have to use the witnesses available. But I emphatically deny that we are obliged to sign the defendant's death warrant simply because a jury has believed an improbable tale told by four vile criminals to shift the death penalty from themselves to another. I now proceed to the principal considerations which lead me to think that the improbable story is incredible.

1. The defendant had no adequate motive, when the People say he committed the crime.

He knew that Rosenthal was trying to injure him, but in fact he had no fear. That is established by his treatment of Rosenthal and by what Rose admits he said. True, Rose and the others had to show motive, and so they made him constantly talk about what would happen when Rosenthal reached the district attorney. Webber and Vallon's testimony as to what was said on that subject at the Harlem conference agrees with such literal exactness as to prove that they had studied and together rehearsed their parts. But more important still, the defendant had no reason to fear. He knew that Rosenthal had tried to get the newspapers to publish his story and failed; that he had complained to Magistrate Corrigan and Chief Magistrate McAdoo that his place had been raided by the defendant on "framed up" affidavits and they had refused to listen to him; that he had tried to reach the police commissioner and the mayor and both had ignored his complaint as that of a gambler, whose place had been raided by the defendant, and that he had tried to induce the district attorney to institute a criminal

prosecution and the latter had investigated and refused to proceed further because unable to find any corroboration.

2. The defendant neither feared nor had reason to fear Rosenthal until the World decided on Saturday, July 13th, to publish the latter's affidavit. If he had planned murder before that, he then knew that suspicion would point to him at once upon the execution of the plan.

In view of his rise to the position of lieutenant of police, he must be credited with at least a grain of sense and with some knowledge of how crimes are detected. If it be assumed that he feared publicity, that had occurred; and if he then had cause to fear removal or a criminal prosecution, both the publicity and that danger were bound to be increased immeasurably by Rosenthal's murder. He certainly had less to fear from the uncorroborated charge of being interested in a gambling place made by a discredited gambler than he had from a charge of murder committed with the aid of eight of the worst criminals to be found anywhere, which was sure to be laid at his door. Before the World publication the defendant had no adequate motive to commit murder; after that he had the strongest motives of self-preservation not to do so. The People say the crime was committed so far as he was concerned long before that publication; the motive generally ascribed to him was furnished by it. In this connection one of the many illuminating inconsistencies in Rose's story may be noted. In his zeal to show a motive back when he says the plan to murder was formed, he relates a conversation with the defendant about the impending publication of Rosenthal's affidavit in the World which was not even contemplated until weeks later.

3. The defendant's conduct just before and after the World publication, aside from the alleged murder talk with Rose on the telephone, was utterly inconsistent with any thought of murder in his mind.

My brother WERNER seems to attach importance to the defendant's visit to the *World* office at midnight on Saturday, July 13th, and the district attorney even argues, to use his phrase, that the defendant's efforts "to kill the story" tend to prove him guilty of the murder, on the theory that both were parts of a single plan. That argument has nothing to rest upon except the sequence of events in point of time and the fact that the defendant made use of Rose to "kill the story." The defendant did attempt to prevent the *World* publication. Not succeeding in that attempt, he visited the *World* office late Saturday night with his counsel to get copies of the affidavit, on which to institute a prosecution for criminal libel, and to make a statement which the *World* published later. He endeavored to get an affidavit from Dora Gilbert, Rosenthal's former wife. His first efforts were unsuccessful. Toward evening Monday he requested Rose to take two men named to her apartments and to assist them in getting her affidavit for publication the next day. Rose also took along Schepps and Vallon. Late Monday night a reporter of the *Morning Telegraph*, presumably sent by the defendant, called at Dora Gilbert's and took away a copy of her affidavit for publication. Late that night and within a few hours of the murder, the defendant was again at the *World* office to return some clippings relating to Rosenthal which he had borrowed. Earlier in the day, according to Rose, the defendant had requested him to have Webber see three men of suggestive nicknames in the underworld, who had been subpoenaed to appear before the grand jury, to persuade them not to corroborate Rosenthal. Yet we are asked to believe that this lieutenant of police within a few hours of a contemplated murder was exhibiting to the newspapers his concern over a charge made against him by his intended victim, and that he was expending his energies to obtain evidence to discredit a man about to be killed and to prevent witnesses from

corroborating testimony that was never to be given. And more incredible still, that to accomplish such useless results he was using the very men by whom he intended to commit the murder.

4. The defendant's request did not in fact supply the motive which induced Rose, Webber, Vallon and Schepps to commit the murder. This is shown to a demonstration.

Note the sequence of events. The request is made of Rose, he sees the " gunmen," they are in readiness, nothing remains but for him to give the word, but nothing is done. Webber is called in because of his supposed influence with the " gunmen;" still days lengthen into weeks, and nothing is done. Rosenthal publishes his affidavit, an investigation of the doings in the underworld and especially of the gambling business is impending; one of their number, against whom the evidence shows Rose, Webber and Vallon each had an independent personal grievance, has become a " squealer;" preparations begin, and within a short time Rosenthal is dead. It would take too long to analyze all of the inconsistencies in Rose's attempted explanation of the delay in executing the murder plan. They are many and of such a character as in my opinion to stamp his story so far as it involved the defendant as a pure fabrication. One fact is too plain to be denied. Rose and his associates required an independent motive. It was supplied by an event which cast suspicion on the defendant. Here note another piece of illuminating testimony. Rose makes the defendant say to him in the last telephone conversation before the murder: " Now, there is still time, to-night is the time and it will just fit. It will look like the gamblers did it on account of his threatened squeal." Imagine the defendant telling the men whom he had employed to commit murder that the time was ripe because they would be suspected! Rose doubtless reflected, and found security in the reflection, that suspicion would be cast on the defendant; and with the kind of cunning

frequently exhibited by such men, it occurred to him on the trial to attribute to the defendant a reason exactly opposed to the one which in fact had actuated himself.

It may be said that the foregoing considerations admit of argument. Let that be granted. I now come to two matters concerning which, it seems to me, reasonable minds cannot differ, and which add to improbability and incredibility a virtual demonstration of falsity.

1. The story of the Harlem conference is incredible on its face and the manner of its narration by the witnesses proves it to be a pure fabrication.

The district attorney does not deny, and the dissenting opinion admits, that it is essential to the People's case. It served no possible purpose except to supply witnesses to a murder compact. It is said that the "gunmen" were actuated by the defendant's powerful influence, but the alleged purpose of the Harlem meeting was to secure Webber's influence with them, and Rose already had their promise to do the deed on call. True, Rose says the defendant accused him of "stalling," but if the defendant did not trust Rose, he would not have been likely to call in another whom he trusted less. If, as the People claim, Rose was the defendant's confidant, "stool-pigeon" and collector of "graft," he might possibly have employed him as a "go-between" even to arrange a murder compact, but it is improbable that he would have called in a second "go-between," and incredible that he would have admitted a third and a fourth for no purpose whatever. If he wanted to talk with Webber, he could have done it without calling him to Harlem and without having witnesses present; and yet he is accused of having asked Rose to bring Webber to Harlem to plan a murder, and then of having calmly proposed the murder in the unexpected presence of a third person, a comparative stranger, while another stranger stood just out of hearing to be a corroborating

witness. Now note, the place of the appointed meeting was Harlem; the time, about nine o'clock. Nothing more definite. By a strange coincidence, the defendant, Rose, Webber, Vallon and Schepps found themselves at One Hundred and Seventy-fourth street and Seventh avenue, all arriving about the same time, and Webber said that on leaving his poker room at Forty-second street he looked at his watch, as he had an appointment to meet a friend named " Itzky," and it was then eleven-thirty. If the story was a fabrication, it was important to fix the time and place, so as not to admit of contradiction. The place was a vacant lot in Harlem. The time, they refused to fix, either the day of the week or the month. They thought it was the latter part of June, but Schepps, who remembered the number, 2529 Seventh avenue, where the " gunmen " lived, said it might have been as early as May. Three of these men were telling their story to the district attorney within a few days after the murder, when the Harlem meeting, if it occurred, must have been fresh in their minds, and when at least they must have had means of fixing the date. Their unwillingness to fix a date, and their evasive manner of testifying on the subject, which cannot be portrayed in an opinion, prove the falsity of their testimony. But there were two witnesses who could have corroborated their story, the two chauffeurs, who drove them to the meeting, and they were not produced. If nothing more appeared, the failure to produce the two chauffeurs or to account for their non-production would condemn the story as false. But more did appear. Schepps, to account for not hearing the conversation, unwittingly no doubt, said that he remained talking with the chauffeur with whom he was well acquainted. Pressed to give the name, he evaded, and finally gave nicknames, " Itch " and " Moe Levy." The People then certainly could have produced at least one of the chauffeurs. Of this more, later.

2. Schepps was an accomplice.

I now briefly outline his connection with the case according to the People's evidence. He and Rose were bosom friends and almost constant companions. He went to see the " gunmen " at least three times before the murder, taking money and messages from Rose. He knew them to be " pretty tough customers." He was at the Harlem conference, but remained where he could see and not hear. After the meeting he rode downtown in the same car with Rose, Webber and Vallon. During that ride not a word was said of the proposed murder, though Webber and Vallon had had no inkling of it before the meeting. He went on the Sam Paul outing with Rose, Webber and Vallon, and, though every one else was talking of Rosenthal's " squeal," he heard not a word of it. The next day and within twelve hours of the murder he accidentally met Rose and Vallon at Luchow's on Fourteenth street. But he went out and stood on the sidewalk " from lunch time until evening " while Rose and Vallon discussed murder inside. That night he was at Dora Gilbert's with Rose and Vallon. When the tire blew out on their way to Sharkey's saloon from there he telephoned for the " grey car " for Rose, and when it arrived he went with Rose and Vallon to One Hundred and Forty-fifth street, where the " gunmen " were expected to be. He rang the hall bell for Cirofici, and when the latter appeared heard Rose ask where the rest of the crowd were and Cirofici's reply that they had been sent for to come downtown. He returned with Rose, Vallon and Cirofici to Webber's poker room, where they were joined by the three other " gunmen." On the ride up and back not a word was said of the impending murder. He sat down with the others at a table in Webber's poker room where refreshments were served. He heard Webber say that he would locate Rosenthal, saw him leave and shortly return and heard him report that Rosenthal was at the Metropole. He saw the " gunmen "

immediately get up and go out.   He waited about fifteen min-
utes, went over to the Times Square Building and bought a
soda, heard shots and walked toward the Metropole, learned
that Rosenthal had been shot, walked on and accidentally met
Vallon, said " they just killed Rosenthal, this is no place for
us," went with Vallon to Fourteenth street, and went to bed,
got up at six o'clock and went to One Hundred and Forty-fifth
street at Rose's request to see the " gunmen," made an appoint-
ment to meet them later in the day at Fiftieth street, later was
present when Webber gave Rose the $1,000 to pay the " gun-
men," and went with Rose and saw it paid.   On Thursday, the
18th, he left the jurisdiction and went to Hot Springs, Arkan-
sas, whence he returned on a promise of immunity.   And yet
we are asked to sustain a verdict, which, as my brother WERNER
admits, imports that Schepps was not an accomplice.   And it is
suggested that we should do this for the reason that, four mur-
derers having testified to save their own lives that Schepps did
not know what was going on until after the murder, the ques-
tion was properly submitted to the jury.   Incredible as the
story is, it may be that it presented a question of fact, but we
are dealing with the facts, and a human life depends on our
decision.

It is of no consequence that, independently of Schepps, there
may have been barely sufficient corroborative evidence, though
unworthy of belief, to take the case to the jury.   Schepps not
being an accomplice was an essential element of the story told
by him and his fellow-murderers, precisely as the Harlem confer-
ence was an essential part of it.   Those men knew the rule of
law requiring corroboration of the testimony of an accomplice.
The correspondence between Rose and Schepps while the latter
was at Hot Springs proves it.   They did not propose to run
the risk of a failure of consideration on their part, and so they
framed up their story so as to keep Schepps just out of hearing

of the actual murder talk. Rose did not trust his confidant and inseparable companion until the deed was done, and then he took him back into his confidence.

. The learned trial judge forcibly pressed upon the consideration of the jury the impossibility of fabricating such a story as the four principal witnesses related. It was not difficult. The main part was doubtless true. Together they claim to have met the defendant but twice, and, if their story was true, they could have been corroborated as to the fact of both meetings by witnesses who would not have been impelled by their motives to commit perjury. I have referred to the Harlem meeting. They evidently thought it expedient to connect the defendant with the payment of the $1,000 to the "gunmen." Rose testified that, after the murder, he telephoned the defendant, and it is claimed that there is some corroboration of that. It was a natural thing for him to do regardless of the defendant's complicity in the crime. But he says that the defendant agreed to meet him at Webber's place. He and Rose both testified that later, they disagree as to the hour, they were standing in front of Webber's place at the corner of Forty-second street and Sixth avenue, talking with a man named Jack Sullivan or J. A. Reich, when the defendant arrived; that just then a man named Muttle or Brescher came along; that he and Sullivan walked away together and that the defendant then discussed the murder with them and the course to be pursued and requested Webber to give Rose $1,000 to pay the "gunmen." I shall not discuss the likelihood that the defendant, if guilty, would hold a consultation with two of the murderers on the sidewalk on Forty-second street within two blocks of the scene of the murder two or three hours after its commission. Sullivan was called as a witness for the defense and testified that he was with Rose and Webber at the time and place named and that the defendant did not come there. I shall not discuss the

efforts or methods used to induce him to corroborate Rose and Webber. On the motion for a new trial Brescher made an affidavit corroborating Sullivan.

I now come to a matter which, regardless of all else, requires us to grant a new trial. It turned out that " Moe Levy " and " Itch," the names of the chauffeurs given by Schepps, were nicknames for Harry N. Cohen and Isidor Schoenhaus, partners who had an automobile stand on Fourteenth street, and that one or the other had driven Rose, Vallon and Schepps almost daily since April, 1912. Each made affidavit on the motion for a new trial positively denying that he drove the conspirators to the Harlem meeting or that any such transaction as Schepps testified to ever occurred. It further appeared that during the trial both were called to the district attorney's office and questioned by an assistant.

It is urged in the brief that the testimony of those witnesses would have been incompetent as merely contradictory of Schepps on a collateral matter. Of course, if there was no Harlem meeting there could have been no chauffeurs at it, and, no doubt, Schepps, having fallen into difficulty, got out the best he could by giving the names of friends who, he thought, would stand by him, guarding their identity by concealing their true names. But can any one doubt that a jury would be likely to disbelieve so improbable a story as that of the Harlem meeting, told by four murderers to escape the death penalty, if the only persons named by either of them as witnesses of the occurrence should testify that no such thing ever took place? And will any fair man say that the defendant should be put to death unless another jury find him guilty after hearing the testimony of the men who, Schepps says, drove the conspirators to the meeting where the defendant's crime was committed, if at all? The evidence satisfies every requirement of the rule. (Code Criminal Procedure, section 465,

subd. 7.)   It was newly discovered, it was not cumulative, it was vital.   In view of the course of the trial counsel should not be charged with want of diligence in not locating witnesses from nicknames, especially as the district attorney had the witnesses at his office and neither called them to the stand nor informed the court nor defendant's counsel of them.

In my opinion a new trial should be granted because the newly-discovered evidence imperatively demands it in the interest of justice, because the verdict is shockingly against the weight of evidence, and because the trial was so conducted as to insure a verdict of guilty regardless of the evidence.

WERNER, J.  (dissenting).  It is not a mere figure of speech to say that I deeply regret my inability to concur in the opinion which is about to be adopted in this case.  I am conscious that a single dissent, favoring the extreme penalty in a capital case, should be justified by cogent reason and a compelling sense of duty.  In the case at bar I am constrained to dissent for reasons which I shall briefly set forth.  There are two broad and far-reaching objections which I make to the prevailing opinion, and then I differ from my associates as to the effect of certain specific rulings of the trial justice which are said to be erroneous.

The prevailing opinion, it seems to me, forever disposes of the great issue of fact which it is the province of a jury to decide.   Judges may differ as to the effect and weight of testimony, but it still remains the law that when an issue of fact is created in a case triable by jury the character of the witnesses and the weight of their testimony cannot be disposed of by this court even in a case involving the death penalty.   It matters not that we may go through the form of ordering a new trial when it is certain that this will be a useless ceremony.

The question on the merits in the case at bar is not what some of us may think of the result in view of the alleged errors which it is said were committed on the trial, but what we would be bound to do if the case were before us upon the same testimony and upon a record free from substantial error. Upon that question I think I hazard nothing in saying that there was clearly an issue of fact for the jury. It is true that the main witnesses for the prosecution were gamblers, criminals, degenerates and murderers, as they are denominated in the prevailing opinion, but that goes to their credibility and the weight of their evidence. It does not authorize this court to invade the province of the jury, nor to decide in advance what must be done upon another trial upon a similar state of facts. Section 528 of the Code of Criminal Procedure confers no such power on this court. In speaking of that section we have said that " in determining whether a new trial shall be granted under it, it is not the province of this court to review or determine controverted questions of fact arising upon conflicting evidence, but that the jury is the ultimate tribunal in such a case, and that with its decision the court may not interfere unless it reaches the conclusion that justice has not been done." (People v. Decker, 157 N. Y. 186, 195; People v. Krist, 168 N. Y. 19; People v. Gaimari, 176 N. Y. 84.)

The theory of the prosecution as to the defendant's connection with the killing of Rosenthal is so simple and so generally understood that it seems like a work of supererogation even to refer to it. I shall do so very briefly because the prevailing opinion seems to proceed upon the theory that the only evidence tending to connect the defendant with the murder of Rosenthal is that given by his accomplices with reference to the so-called " Harlem Conference," which is said to have taken place at some time in the latter part of June, 1912. My reading of the record has convinced me that there are a number of

antecedent circumstances and occurrences, some of which are testified to by witnesses who are not accomplices, that tend very strongly to support the theory of the prosecution that the defendant, although not physically present at the commission of the homicide, was in fact a participator therein. A few salient facts bear out this contention. The defendant was a police officer, whose peculiar duties brought him in close touch with the denizens of the underworld of New York. That he was on terms of intimacy with men like Rosenthal is demonstrated by the record. The jury had the right to find that the defendant, through Rose, entered into an agreement with Rosenthal to advance to the latter the sum of $1,500 for the purpose of establishing a gambling place; and that the agreement contemplated a division of the profits between Rosenthal, Rose and the defendant. The district attorney contends that this agreement was evidenced by a chattel mortgage for $1,500 which was given by Rosenthal to a man named Donohue, who was a dummy for the defendant. That such a mortgage was given is a matter of record. That Rosenthal did open a gambling place is a conceded fact, and the evidence clearly indicates that for various reasons it never prospered. The jury further had the right to believe that Rosenthal began to talk about his connection with Becker, and to pass severe strictures upon his unfairness in having taken a chattel mortgage which even included Rosenthal's household furniture. We know that Rosenthal's place was raided on April 17th, 1912, under the direction of the defendant, pursuant to orders received from his superior officers; and the record discloses that this was probably brought about by the reports, which reached police headquarters from time to time, to the effect that Rosenthal was conducting a gambling place under the protection of Becker. Rose and Mrs. Rosenthal both testified that at the time of the raid the defendant agreed to satisfy the chattel mortgage in

consideration of the injury to which Rosenthal was being sub-
jected, and it is a matter of record that the mortgage was
in fact discharged on April 25, 1912, only eight days after
the raid. In that connection it is significant also that on July
17, 1912, the day after the shooting of Rosenthal, the defend-
ant's attorney, Hart, sought Rose at the place where he was
then in hiding and obtained from him an affidavit to the effect
that Rose, and not the defendant, had made the loan to Rosen-
thal.

The jury further had the right to find that Rosenthal had
definitely concluded to get even with the defendant at any
cost. That this was a matter of no small concern to the de-
fendant is easily understood, and that he was greatly troubled
by it is clearly indicated by the testimony. During the in-
terval between the raid and the shooting Rosenthal had been
trying to reach the authorities with his complaints against
the defendant. It is said that he applied in turn to Police
Commissioner Waldo, to Magistrate Corrigan, to Chief Magis-
trate McAdoo and to Mayor Gaynor, and that he threatened
to go to the district attorney. It is an undisputed fact that
he finally succeeded in getting a hearing in the office of the
New York *World*, which resulted in the publication of his
affidavit on Sunday, July 14, 1912, setting forth his alleged
relations with the defendant. If Rose is to be believed, Rosen-
thal's threat to go to the district attorney greatly troubled the
defendant, and it requires no stretch of the imagination to
understand that if this was the true situation the defendant
had a strong motive for preventing disclosures which were
likely to ruin him utterly.

That the defendant and Rose were often together during
the period between April and July 16th is amply proven by
evidence outside of the declarations of Rose, and the jury had
the right to find, as a fact, that Rose was in communication

with Zelig, the leader of the so-called "gunmen's gang," while the latter was imprisoned in the Tombs during the month of May, 1912. During the interval between that time and the 20th of June, according to Rose, there were frequent interviews between him and the defendant, in which the subject of getting rid of Rosenthal was discussed, and in the course of which the defendant frequently urged the necessity of doing it as quickly as possible.

From the foregoing skeleton of a few of the occurrences which the jury had the right to consider as a part of the history of this crime, it will readily be seen that the so-called "Harlem Conference" was not the sole reliance of the prosecution in attempting to establish the guilt of the defendant. It may, of course, be taken as true that if the jury had found the story of the "Harlem Conference" to be a pure fabrication, the defendant never could have been convicted. But the fact remains that the narrative of this part of the case was strongly fortified by the evidence which had preceded it. As to the "Harlem Conference" it is enough to say that four witnesses testified that the defendant attended it, and no one denies it. If there is any truth in the testimony bearing upon that important part of the case, the conclusion is inevitable that the defendant was present and that he urged the other conspirators, Rose, Webber and Vallon, to aid him in doing away with Rosenthal.

The shooting took place in the early morning of July 16, 1912. The manner in which Rosenthal was assassinated is known of all men and we need not dwell upon its awful details. For present purposes it suffices to say that we are about to decide, in another case, that the "gunmen" were guilty of that crime. Rose says he hired the "gunmen." Whatever else may be said of the complicity of these thugs in this affair, it was obviously not adventitious or emergent. All the circumstances

indicate that it was the result of a bargain with some one. With whom? The prevailing opinion lays stress upon the contention for the defense that there is ground for the suspicion that the services of these " gunmen " were enlisted by the confraternity of gamblers who, to the number of several hundred, attended the outing of the " Sam Paul Association " on Sunday, July 14, 1912, and this suspicion seems to be founded upon the assumption that the Rosenthal disclosures in the *World*, which were the subject of general discussion on that outing, are a sufficient explanation of the reasons for the killing of Rosenthal within forty-eight hours thereafter. These suggestions naturally bring to mind several facts and circumstances which should not be overlooked. These " gunmen " were creatures who, so far as the record discloses, had no connection with the gamblers of New York city. They belonged to a different stratum of society, and they had nothing to fear except from the police. They had no personal interest in getting rid of Rosenthal, and it may, therefore, be assumed that their activity in this affair was stimulated either because of a command from some one " higher up," or by the price which they were to receive. In looking about for some one who combined one or both of these elements the record naturally turns our view to the defendant. He was a police officer, whose peculiar duties invested him with great power in dealing with the vice of a great city. We find this powerful police officer in the office of the New York *World* at midnight of Saturday, July 13, 1912, in response to an intimation that this newspaper was to publish in its next morning's issue the affidavit of Rosenthal containing a detailed account of the alleged relations between him and the defendant. The purpose of his visit need not be discussed. That he was interested in preventing this disclosure is too obvious for surmise. On the following day, and again on Monday, the defendant devoted considerable time,

through Sullivan, Rose and others, to getting an affidavit from Dora Gilbert, the former wife or mistress of Rosenthal, concerning the life and general character of the latter. In these circumstances, it must be plain that the theory of the defense based wholly upon surmise and conjecture, to the effect that Rosenthal was probably killed by the " gunmen " at the instance of the gambling fraternity, is overborne by the actual evidence tending to establish the defendant's motive for the crime and his participation in the arrangements which led to its commission.

It is true, as stated in the prevailing opinion, that the witnesses Rose, Webber and Vallon for the prosecution were confessed murderers. They were testifying under agreements granting them immunity from the penalty of their crime. That fact cannot be denied. Their own lives were at stake and they needed no extraneous incentive to perjury. In the interest of fairness all this must be admitted. That is not a sufficient reason, however, for judicially denying to their testimony its proper probative force within the restrictive rules under which such evidence is always to be submitted to a jury. As these witnesses were all accomplices as matter of law, their testimony could of course have no probative value unless it was corroborated. As to many details the story of Rose is corroborated by other witnesses. In regard to the " Harlem Conference," there is no such corroboration of either Rose, Webber or Vallon, unless it is found in the testimony of Schepps. The prevailing opinion suggests that some of the members of the court think the evidence insufficient to justify the finding that Schepps was not an accomplice. To that proposition I decline to assent. All the evidence bearing upon the presence of Schepps at the " Harlem Conference " is to the effect that he was not within hearing range of the parties to it, and he testified that he did not know of the purpose of the meeting until some

days after it had taken place. Schepps testified that the defendant was there; and if Schepps was not an accomplice that was direct and explicit corroboration of the others who were concededly accomplices as matter of law. I think it was proper for the trial court to submit to the jury the question whether Schepps was an accomplice or not (People v. Katz, 209 N. Y. 311, and cases cited), and this the trial justice did in strict accordance with the legal rules relating to the subject. The verdict of the jury necessarily imports a finding that Schepps was not an accomplice and it must, therefore, be assumed for the purposes of this review that the evidence of Rose, Webber and Vallon was corroborated within the provisions of the statute. (Code Crim. Pro. sec. 399.)

The prevailing opinion severely criticises the trial justice for his conduct in refusing to grant the requests of defendant's counsel for an adjournment of court pending the cross-examination of Rose. Some of these criticisms, so far as they bear upon the correctness of the rulings, may be justified. There are others which, according to my reading of the opinion, go so far as to impute to the trial justice certain motives or reasons for making the rulings. That I regard as wholly beyond our province. The direct examination of Rose had taken four hours, the cross-examination covered six hours, and the session of court had continued long beyond the usual time. We can all easily imagine that such an ordeal would be likely to tax the endurance even of a seasoned trial lawyer. We may admit that the court might better have postponed the examination to another day even though there may have been reason to believe that defendant's counsel had fairly exhausted his right to cross-examination. We all agree that the right of cross-examination, sacred as it is, has its limits. How long it shall continue, and what its scope shall be, is usually a matter wholly within the sound discretion of the trial court. Since the right

of cross-examination is a substantial one it must, of course, not be arbitrarily or capriciously interfered with; but I think it is quite within bounds to say that trial courts err much more in the direction of undue latitude in the allowance of cross-examinations than in curtailing them improperly. Be that as it may, it is always a question to be decided with reference to the particular facts before the court. I venture to say that no judge reading the cross-examination of Rose could assert dogmatically that it might have been profitably extended. It covers 300 folios and seems to touch upon every point. Let us assume, however, that the trial justice erred. It appears that he later changed his views and gave the defendant's counsel further opportunity for cross-examination. The prevailing opinion says it was then too late, but no reason is given for this assertion and the fact remains that the opportunity given by the trial court was not accepted by defendant's counsel. In these circumstances I find it impossible to say that the rulings of the trial court in this particular constitute error for which this judgment should be reversed. Much less am I willing to subscribe to an opinion in which, as I have already intimated, this court assumes to criticise the trial court, not merely in respect of the correctness of its rulings, but also regarding the mental and moral attitude by which the court may have been actuated in making them. That is no part of our jurisdiction.

As I read the very able prevailing opinion it seems to emphasize the idea that the trial was characterized by a succession of rulings none of which considered alone would justify a reversal of this judgment, but which in their collective force created an atmosphere so inimical to the defendant's legal rights as to entitle him to a new trial. It is quite true that the atmosphere of a trial room cannot be transplanted to the chambers of an appellate tribunal, and, therefore, we must rely upon the examination of the record to see whether the specific

instances of alleged error, either singly or collectively, are of such importance and character that they must conclusively be presumed to have influenced the action of the jury adversely to the defendant. Without dwelling longer upon the general features of the trial I shall, therefore, address myself at once to some of these specific instances.

The first episode of the trial is characterized as " an unfortunate scene which fairly foreshadowed the relationship of antagonism which was to prevail between the trial judge and defendant's counsel." The occasion for this animadversion was an application for a postponement of the trial on the ground of the illness of one of the defendant's counsel, and which, in the language of the prevailing opinion, " was promptly and, very probably, properly denied; " this was followed by a second application upon the further ground that the defendant could not obtain a fair trial. Defendant's counsel insisted upon being heard orally and the court ruled that an affidavit must be submitted. Who was right? I had supposed it to be a well-established rule of criminal trial practice that such an application is always to be made upon affidavits, and not upon oral argument in the presence and hearing of the panel from which a jury is to be drawn. The context of the record clearly indicates that defendant's counsel was quite as much interested in airing his views before the panel then in attendance as he was in addressing his application to the presiding justice. I think the application was properly denied.

Some of the district attorney's statements in his opening to the jury are criticised as unfair and prejudicial to the defendant. That presents the vexed question which is now never absent from a capital case of any importance. It is one of those subjects with reference to which the courts can lay down no hard and fast rule. Even if it be conceded that some of the district attorney's opening remarks went beyond the range of

the evidence that was later ruled to be competent, the question still remains whether the defendant was harmed. The particular instance of which most is made is the one in which the defendant is referred to as a " grafter," a collector of blackmail and protection money from illegitimate resorts. Whatever was said upon that subject was at first permitted to stand, but later the court ruled that the district attorney would be permitted to state " that Rose was connected with the defendant in business, and with the deceased person; " and this was coupled with the admonition, " do not characterize the business. When it comes to the introduction of testimony, that question can be considered." Even upon the assumption that the statement was allowed to stand as made, I think it can be justified by the subsequent conduct of defendant's counsel in introducing the written statement of Rose containing a detailed account of his dealings with defendant in the collection of tribute from disorderly houses.

Vallon, one of the conceded accomplices, was being cross-examined by the defendant's counsel. He was interrogated about the agreement for immunity under which he was a witness for the prosecution. Defendant's counsel demanded the production of the written paper. The district attorney refused to produce it unless the court should direct him to do so, and the court declined. I can find no legal error in this ruling. Doubtless the court might better have granted the request as a matter of courtesy, but that is not the question before us. What right had the defendant to the production of this paper, when the fact of the agreement was admitted? It was purely a collateral matter, not in controversy, and as to the effect of which, upon the testimony of the witness, there could not be the slightest misunderstanding. It may be added that the writing was later produced, but that does not affect the merits of the ruling excluding it. Somewhat the same criticism is made

upon the trial court's ruling in refusing to direct that certain depositions, taken by commission in Hot Springs, Arkansas, should be opened. These depositions related to the conduct and admissions of Schepps while he was at Hot Springs, after the shooting and before the trial. While Schepps was being cross-examined defendant's counsel requested that the commissions be opened so that he might use them in framing questions. The court declined to give any such direction unless the commissions were read in evidence. I am inclined to think that this ruling was technically correct. Section 655 of the Code of Criminal Procedure prescribes that " if the commission and return be transmitted by mail, the clerk to whom it is addressed, must open and file it in his office, where it must remain unless the court otherwise direct; " and section 656 provides that " the commission and return must at all times be open to the inspection of the parties, who must be furnished by the clerk with copies of the same, or of any part thereof, on payment of his fees." These two sections indicate that so long as the commission is· on file it shall be open to the inspection of both parties; but the following section (657) seems to make it clear that if a deposition taken under the commission ·is to be used on the trial it must be read. The provision of this last section is that such a deposition " may be read in evidence by either party on the trial." I am inclined to think that, under these provisions of the Code, defendant's counsel was not entitled to use, for the purposes of cross-examination, the depositions returned in the commission until they had been read in evidence. But even if that is not so, the trial justice later reversed his ruling and granted the request of defendant's counsel.

Rose had made a written confession to the district attorney. The *World* published what purported to be a copy of it. The defendant's counsel tried to use this copy in cross-examining

Rose. Upon the objection of the district attorney the court refused to permit it. Defendant's counsel then asked for the original, and the court declined to direct that it be produced. Several days later the court changed its ruling and allowed the production and use of the paper upon the condition that it should first be put in evidence. I do not understand that the correctness of the latter ruling is challenged, except on the score of being too late. Since we are not advised that anything which occurred between the first ruling and the second had rendered the document less useful to the defendant, it seems to me there was no legal error in this ruling.

It is urged that the trial court was guilty of an error of law in excluding testimony designed to show that Rose, Webber, Vallon and Schepps were inmates of the same prison under conditions which gave them an opportunity to converse with each other. I agree with the statement in the prevailing opinion that " as a matter of common sense there can be no doubt that it was important to know whether they were in constant communication with each other," and that as matter of law the evidence was competent. No one will assert, however, that this is an error for which alone this judgment should be reversed. The record discloses, however, that the harmful effect of this ruling, if any, was considerably modified by a bit of evidence that crept in. Mr. Ryan, the keeper of the prison, was on the stand, and he was permitted to testify that the " cells were located one after the other, 1, 2, 3, 4. There were hours of exercise, when they walked the same as anyone else." That brief statement of the witness tells the story as completely as though he had been permitted to give testimony covering pages of the record, and the fact which defendant's counsel was seeking to establish was as clearly shown as though it had been reiterated over and over again.

The general tenor of the charge is criticised, but no excep-

tion is discussed. It seems to be admitted that the trial justice "defined with accuracy many of the principles of law which governed the jury in their consideration of the evidence and in the disposition of the questions of fact," but it is said that he "outlined in much detail and most effectively the claims of the prosecution and the evidence which had been produced to support those claims, leaving it to the jury, with few and meagre exceptions, to evolve from their own unaided memories the recollection of any arguments or evidence in behalf of defendant which tended to contradict such arguments and evidence of the prosecution." It sometimes happens that such a presentation is due to the overwhelming preponderance of evidence and argument in favor of the prosecution, and when that is the case the defendant is not entitled to have the case presented as he would like it, but as it is. That rule is very clearly stated in People v. Fanning (131 N. Y. 659, 663, 8 N. Y. Crim. 363) where this court said that the judge "should not refrain from a just, accurate and clear presentation of the evidence to the jury, simply because when so presented it may fairly be regarded by the jury as bearing hardly upon the accused." I have read with great care the charge in the case at·bar, and I am unable to see wherein it is erroneous. The prevailing opinion points out no specific errors of substance and I have discovered none. The variance in the volume and character of the evidence adduced respectively for the prosecution and the defense seems very satisfactorily to explain those features of the charge which are criticised.

Holding the views which I have thus briefly and imperfectly expressed, I vote for affirmance.

CHASE, COLLINS, CUDDEBACK and HOGAN, JJ., concur with

HISCOCK, J., and MILLER, J., concurs in opinion; WERNER, J., reads dissenting opinion.

Judgment and conviction, etc., reversed and new trial ordered.